David Amesbury, Esq.
Nevada State Bar No. 3889
**AMESBURY LAW OFFICE**
730 S. 8th Street
Las Vegas, Nevada 89101
(702) 385-5570
*Attorney for Debtor/Adversary Plaintiff*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>THE MEDICAL SPA,<br><br>       Debtor.<br>_____<br>THE MEDICAL SPA,<br><br>       Plaintiff,<br><br>vs.<br><br>Carl N. Williams, M.D.; Donald A. Andreas;<br>Nevada State Board of Medical Examiners,<br><br>       Defendants.<br>_____ | Case No. **BK-10-31638-BAM**<br><br>Chapter **11**<br><br><br>**ADVERSARIAL COMPLAINT for:**<br><br>**(1) Tortious Interference with Contractual Relations**<br><br>**(2) Breach of Contract / Business Agreement**<br><br>**(3) Determination of Creditor Status**<br><br>**(4) Assumption of Lease** |

## INTRODUCTION

1.     This is an action for actual and punitive damages filed by the debtor, THE MEDICAL SPA, a Nevada Limited Liability Company, by and through its counsel of record, DAVID AMESBURY, ESQ., pursuant to 11 U.S.C. § 105; Bankr. R. Civ. P. 7001.

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred on this Court pursuant to the provisions of 28 U.S.C. § 1334 in that this proceeding arises in and is related to the above-captioned Chapter 11 case under Title 11 and concerns the business and property of the debtor in said case.

3.      This Court has both personal and subject-matter jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1334, 157(b)(2)(A), (C), (E), (L), and (O).

4.      This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

5.      This matter is primarily a core proceeding, and therefore the Bankruptcy Court has jurisdiction to enter a final order.  In the event this case is determined to be a non-core proceeding, then and in that event, Plaintiffs consent to the entry of a final order by the Bankruptcy Judge.

6.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7.      The Plaintiff, THE MEDICAL SPA ("Plaintiff"), a Nevada Limited Liability Company, is a debtor under Chapter 11 in case number 10-BK-31638, which case is presently pending before this Court.  Plaintiff is also the licensed business entity in question concerning all claims against all parties herein.

8.      Defendant, Carl N. Williams, M.D. ("Williams") is an individual, believed to be residing in the County of Clark, State of Nevada.

9.      Defendant, Donald A. Andreas ("Andreas") is an individual, believed to be residing in the County of Clark, State of Nevada.

10.     Defendant, Nevada State Board of Medical Examiners ("Medical Board"), is the state governmental agency which licenses and disciplines medical doctors (M.D.s) and physician assistants (P.A.s). On its website, the Medical Board lists its address as 1105 Terminal Way, Suite 301, Reno, Nevada 89502.

## GENERAL BACKGROUND

11.     The Medical Spa came into existence in 2003.  It was founded by Tracy Lee Hurst, who has been its sole Managing Member since 2004.  Ms. Hurst also serves as the company's Registered Agent.

12.     Ms. Hurst's vision for The Medical Spa was that it would provide high-quality cosmetic and "day spa" services (such as Botox and laser skin treatments) and fill a demand for

such services by offering them at competitive prices.  At times over the years, The Medical Spa has proven it can be a very successful and highly profitable business.

13.    Due to the "medical" nature of the business, state rules and regulations are expectedly strict, and punishment for non-compliance can be severe.  However, Ms. Hurst has always endeavored to comply with all existing laws; thus, The Medical Spa has always carried a current and valid business license, and has always had at least one supervising physician available for all such procedures which require it.  In addition, proper certification of all other medical assistants or practitioners is verified and posted before services are performed.

14.    Because the business has been successful, other parties have attempted to unlawfully divert and take monies which otherwise would have paid to The Medical Spa.  One such instance was the subject of a 2008 lawsuit filed in Clark County, Nevada, by Ms. Hurst in which it was alleged that a "retired" plastic surgeon, together with his wife who worked for the Medical Spa during the day, used the business' facility for secret "after hours" and "cash only" procedures without Ms. Hurst's knowledge or permission.  The said lawsuit, Case No. A577797, was stayed upon the filing of the instant bankruptcy proceeding.

15.    In addition, Ms. Hurst has experienced what she believes to be a disproportionate amount of "interference," over and above the standard regulatory restrictions, by parties who apparently would like nothing more than to see The Medical Spa shut down, ostensibly because it is run and operated by a non-medical professional.  The instant lawsuit contains but one example of such interference.

16.    The tragedy of this matter is that The Medical Spa has already demonstrated that, by being a successful and profitable business, it can create jobs and keep people working, fulfill a need for cosmetic services at competitive prices, generate revenues and taxes for the state, and generally provide a steady stream of commerce in an otherwise traumatized economy – but due to undue influence and unfair acts by certain parties who have expressed their desire to shut this business down, The Medical Spa had no other alternative but to file the instant Chapter 11 reorganization.  If Ms. Hurst was simply allowed to do what she does best and promote her business, not only would it thrive again, but it would help re-energize the Las

Vegas economy and job market.

## FACTUAL ALLEGATIONS

17.    The Medical Spa began operations at its current location in Boca Park in or around May of 2010.

18.    Beginning in or around January of 2010, Defendant Carl N. Williams, M.D. had been one of the supervising physicians for The Medical Spa at its east side location prior to the acquisition of the Boca Park facility.

19.    Dr. Williams and The Medical Spa were operating under what was essentially a business partnership at the east side location which essentially would continue as the working arrangement at the Boca Park facility.

20.    To acquire the lease at Boca Park, it was necessary for Dr. Williams to use his name and credit.  Dr. Williams executed a ten-year lease.

21.    The facility at the new Boca Park location contained more office spaces than The Medical Spa would utilize; therefore, the plan was for the partnership to rent out the unused offices to other independent practitioners and thus reduce the rent for The Medical Spa. Dr. Williams made several representations that he had "arranged" tenants for the other offices, but his said tenants never materialized.  Ms. Hurst alleges that she could have easily filled the offices with tenants who would be paying rents and providing services.

22.    The Medical Spa, through its Manager, Ms. Hurst, paid the rent and the utilities at the Boca Park location.

23.    In or around August of 2010, two separate patient complaints were made against Dr. Williams, the supervising physician, and Angie Lorenzo, the Physician Assistant who performed the complained-of treatments.  Both complaints alleged "permanent damage," one stemming from a Botox treatment, the other from a "Derma Filler" treatment.  The patients registered their complaint with the Defendant Medical Board.

24.    As a result of the said patient complaints described above, a hearing was held in September 2010 with Dr. Williams and Defendant Donald A. Andreas, an investigator with the Medical Board.

25.     Apparently, Dr. Williams claimed he was not the supervising physician for The Medical Spa at the time Ms. Lorenzo performed the complained-of procedures, even though to act as supervising physician, Dr. Williams was not required to be present in person at the facility, but needed only to be available by telephone.

26.     Shortly after the said hearing, and in or around September of 2010, Dr. Williams approached Ms. Hurst and informed her that he needed to "protect" himself by creating and back-dating a separate lease/rental agreement which would make it appear as though The Medical Spa was "subleasing" space from Dr. Williams.  The first of two such "sublease" agreements, called the "Rental Agreement," was quickly drafted, filled in and signed by the parties, and is attached hereto as Exhibit "1."

27.     Thereafter, and in or around October of 2010, a second "sublease agreement," called the "Nevada Commercial Rental Agreement," was executed by Dr. Williams and Ms. Hurst for The Medical Spa.  The said rental agreement was "made effective" October 17, 2010, and is attached hereto as Exhibit "2."

28.     It is unclear as to exactly how such back-dated and inoperative rental agreements would "protect" Defendant Williams in any manner; however, neither agreement reflected the actual terms under which Dr. Williams and The Medical Spa had been conducting their business at any time prior or since.

29.     Plaintiff alleges that Defendant Williams was improperly influenced by Defendant Andreas acting individually and/or through his position with Defendant Medical Board in an attempt to get Williams to breach his agreement with The Medical Spa, and to interfere with or otherwise hinder The Medical Spa's business and eventually evict and remove said business from the premises.

30.     The business relationship between Dr. Williams and The Medical Spa has since deteriorated.  The Medical Spa continues to work with other supervising physicians, but Dr. Williams and the other Defendants are apparently set on working together to shut down The Medical Spa and force it out of its present location.

/ / /

### FIRST CAUSE OF ACTION
**Tortious Interference with Contractual Relations**
**(Defendants Donald A. Andreas and Nevada State Board of Medical Examiners)**

31.    Plaintiff refers to and incorporates by reference each and every preceding paragraph as though fully set forth herein.

32.    Plaintiff alleges that Defendant Donald A. Andreas unduly influenced Defendant Carl N. Williams to breach his working contractual agreement with Plaintiff.

33.    Immediately following a hearing with Defendant Andreas regarding the two separate patient complaints described herein, Defendant Williams represented to Plaintiff's Managing Member Tracy L. Hurst that he needed to "protect himself" by having The Medical Spa execute back-dated "sublease" agreements which would make it appear as though The Medical Spa had been "renting" space from Dr. Williams since it first moved into the Boca Park location.

34.    Since she believed Dr. Williams' representations would allow The Medical Spa's business to continue, Ms. Hurst did execute the said "sublease" agreements on behalf of the Plaintiff.

35.    Neither "sublease" agreement was, or is, the actual operating agreement under which Plaintiff and Dr. Williams conducted business at present, or any time prior.

36.    Ms. Hurst, on behalf of the Plaintiff, had previously complained to the Medical Board about undue influence being asserted upon the Medical Spa's physicians, as many of the said physicians expressed concerns about continuing to work with a company that the Medical Board apparently wanted shut down.  In some instances it was said that the "license was in jeopardy."

37.    Dr. Williams expressed to Ms. Hurst a similar concern, stating that he needed to "protect himself" by "separating" his practice from The Medical Spa.  Dr. Williams also stated that the Medical Board had a "huge" file on the Medical Spa and it was made clear that the Medical Board and/or Donald A. Andreas were "determined" to put The Medical Spa out of business, and that The Medical Spa should be "evicted" from its present location.

38.     In apparent compliance with the aforesaid statements from Defendant Andreas, Dr. Williams created and presented to Ms. Hurst what were essentially bogus sublease agreements, stating that it was necessary to back-date them to the original date that The Medical Spa first entered the Boca Park facility, and expressed an urgency for Ms. Hurst to sign them.

39.     At a later date, and in or around November of 2010, Defendant Andreas contacted another of The Medical Spa's supervising physicians, one Dr. Simmonds.   Dr. Simmonds, however, did not feel the need to break his working arrangements with The Medical Spa as a result of the attempted interference by Andreas, and continues to this day to be one of its supervising physicians.

40.     The continued attempts by Defendant Andreas to influence physicians to break their agreements with Plaintiff The Medical Spa, in disregard to the complaints of Ms. Hurst as Manager of Plaintiff, indicates that Andreas is working with the approval of the Nevada State Board of Medical Examiners ("Medical Board").  Thus, the Medical Board is a participant and a named Defendant to this cause of action.

41.     As a result of the acts of the Defendants Andreas and the Medical Board, Plaintiff has and continues to suffer damages in an amount that exceeds $10,000.00.

42.     It has been necessary for Plaintiff to retain the services of counsel to bring this action. Accordingly, Plaintiff is entitled to recover attorney's fees and costs herein.

43.     In addition, the acts of the Defendants were done with malicious intent and beyond the scope of the authority of the established rules and regulations which these Defendants are obligated to uphold.  Therefore, Plaintiff is entitled to punitive damages.

### SECOND CAUSE OF ACTION
**Breach of Contract / Business Agreement**
**(Defendant Carl N. Williams, M.D.)**

44.     Plaintiff refers to and incorporates by reference each and every preceding paragraph as though fully set forth herein.

45.     Plaintiff alleges that, shortly following a hearing with the Nevada State Board of

7

Medical Examiners regarding two patient complaints, Defendant Carl N. Williams, M.D. breached his working agreement / contractual relations with Plaintiff The Medical Spa by presenting two bogus "sublease" agreements, which purportedly would allow Dr. Williams to "protect himself."

46. The said "sublease" agreements make it appear as though The Medical Spa was "renting" space from Dr. Williams, when in reality, it was The Medical Spa that always paid the rent and the bills for the entire facility, including the office spaces which were unused by both parties. In fact, the second "sublease" agreement is the same Commercial Rental Agreement that The Medical Spa and Williams would have used to lease space to other practitioners.

47. In addition, Dr. Williams breached his working agreement with The Medical Spa by stating to the Medical Board that he was not the supervising physician at the time of the hearing regarding the two separate patient complaints.

48. Furthermore, Dr. Williams intentionally missed and/or made himself unavailable for patient consultations in the period following the said hearing with Andreas, and ultimately, made it impossible for The Medical Spa to utilize his services as a supervising physician or in any other capacity.

49. Basically, the fact that Dr. Williams virtually "caved in" to the interference of Defendant Andreas mentioned in Plaintiff's First Cause of Action effectively ended the working relationship that had existed between Dr. Williams and The Medical Spa, as Dr. Williams thereafter did all he could to avoid any consultations with patients or availability as supervising physician.

50. As a direct result of the said breach of Defendant Williams, Plaintiff has been damaged in an amount that exceeds $10,000.00.

51. In addition, it has been necessary for Plaintiff to retain the services of counsel to bring this action. Accordingly, Plaintiff is entitled to recover attorney's fees and costs herein.

/ / /

/ / /

### THIRD CAUSE OF ACTION
**Determination of Creditor Status**
**(Defendant Carl N. Williams, M.D.)**

52.     Plaintiff refers to and incorporates by reference each and every preceding paragraph as though fully set forth herein.

53.     This claim is brought against Defendant Carl N. Williams, M.D., pursuant to Federal Rules of Bankruptcy Procedure § 7001(2), which states that an Adversary Proceeding may be brought "to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d)."

54.     Presently, Defendant Williams claims to be a "creditor" in the instant bankruptcy proceeding.   However, the only possible connection which could create a debtor/creditor relationship between the Plaintiff and Dr. Williams is one of the bogus "sublease" agreements created through fraud by Dr. Williams, purportedly to "protect" his medical license by "separating" his practice from the business of The Medical Spa.

55.     Plaintiff contends that no such "separation" is necessary to "protect" any medical licenses from being suspended or revoked by the state Medical Board, and that any such false claim is made solely due to the undue influence by Medical Board investigators, such as Defendant Andreas, put upon physicians working with The Medical Spa.

56.     Plaintiff avers that both of the "sublease" agreements were never, at any time, the actual operating agreement under which Dr. Williams and Plaintiff conducted their business.

57.     Plaintiff also avers that any such agreement which is "back dated" is null and void as it violates the rules of contract.

58.     Based upon these allegations, since the bogus "sublease" is the only connection that would give rise to a claim as "creditor" for Dr. Williams against the Plaintiff, Plaintiff seeks a determination by the Court as to the status of this creditor, and requests that Dr. Williams' claims as creditor be rejected or revised accordingly.

/ / /

**FOURTH CAUSE OF ACTION**
**Assumption of Lease**
**(Defendant Carl N. Williams, M.D.)**

59.    Plaintiff refers to and incorporates by reference each and every preceding paragraph as though fully set forth herein.

60.    It is the business activity of the Plaintiff which is the sole source of patient treatments and revenues generated that are the subject of this matter.  The Medical Spa, if allowed to simply continue to conduct business without undue interference by state regulatory agencies or their rogue agents, could be successful, profitable, provide jobs and services in demand, and generate revenues and pay taxes – all of which would help stimulate the damaged local economy.

61.    The Medical Spa has clearly demonstrated in the past that it can successfully operate a medical "day spa" type of business within legal requirements, and that the Managing Member of The Medical Spa, Ms. Tracy Hurst, does not wish to "practice medicine without a license" but instead, wishes to comply with all regulations that require board-certified physicians' supervision where necessary.  In addition, The Medical Spa requires that all other cosmetic and aesthetic practitioners be properly certified before allowing them to perform services.

62.    Plaintiff represents that there are at least four physicians who are ready and willing to work as supervising professionals for The Medical Spa at its present location.

63.    Plaintiff also represents that it could easily rent out the unused office spaces to other practitioners, as was originally intended by the parties.

64.    In other words, there is a both a market for the types of services offered by The Medical Spa, and a demand for said services; and there is no shortage of industry professionals who can readily see the opportunity to increase their business by participating in partnership with such an already-established business.

65.    Presently, it is Dr. Williams' name that appears on the lease for the premises at Boca Park.  The lease is for a duration of ten years.

66.    Dr. Williams has shown that he is no longer interested in working together with the Plaintiff.  In fact, Dr. Williams has demonstrated that he has breached his working arrangement with Plaintiff in order to assist the other Defendants in their attempt to evict Plaintiff from the present location and "shut down" the Plaintiff's business.

67.    The instant Court may utilize its authority and order that the current lease be assumed by the Plaintiff as part of the reorganization plan of this Chapter 11 case.  Plaintiff avers that it would be in the best interests of the parties to the lease, as well as a more amenable economical solution over all, to allow the current lease to be assumed by the Plaintiff, as it is the Plaintiff's well-marketed business which has always been the subject of interest by practitioners wishing to further promote their practices.

68.    Therefore, Plaintiff respectfully seeks an Order allowing The Medical Spa to assume the existing lease, or in the alternative, for a new lease to be created which would replace the existing lease executed by Defendant Williams.

WHEREFORE, Plaintiff having set forth her claims for relief against Defendants, respectfully prays of the Court as follows:

A.    That Plaintiff have and recover against Defendants a sum to be determined by the Court in the form of actual damages;

B.    That Plaintiff have and recover against Defendants a sum to be determined by the Court in the form of punitive damages;

C.    That Plaintiff have and recover against Defendants all reasonable legal fees and expenses incurred by her attorney;

D.    That this Court make a determination as to the status of purported "creditor" Defendant Carl N. Williams, M.D. as having arisen solely from a fraudulently-created "sublease" which states false terms between Plaintiff and this Defendant, and which was never, at any time, the actual operating agreement between the parties;

E.    That an Order issue allowing Plaintiff to assume the current lease at the Boca Park location; and

F.      For such other and further relief as the Court may deem just and proper.


Dated this 25th day of July, 2011.


                                        ___/s/_____/
                                        David Amesbury, Esq.
                                        Nevada Bar No. 3889
                                        **AMESBURY LAW OFFICE**
                                        730 S. 8th Street
                                        Las Vegas, Nevada 89101
                                        (702) 385-5570
                                        *Attorney for Debtor/Adversary Plaintiff*

## <u>VERIFICATION</u>

I, Tracy Lee Rouse-Hurst, am the Plaintiff in the above-entitled action. Under penalty of perjury, I state the following:

That I have read the foregoing Adversarial Complaint and know the contents thereof; and that the same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

Tracy Lee Rouse-Hurst

STATE OF NEVADA )
                 ) s.s.
COUNTY OF CLARK  )

This instrument was acknowledged before me on the 25th day of July, 2011, by Tracy Lee Rouse-Hurst

_____
(Signature of Notary)

PARVIZ MONTAZER
Notary Public, State of Nevada
Appointment No. 07-5139-1
My Appt. Expires Oct 9, 2011

(Notary Seal)

13

# EXHIBIT "1"

THIS RENTAL AGREEMENT is made this __19__ day of __May__, 2010 between __The Medical Space LLC__ (herein known as "_Rentor_") and Carl N. Williams, M.D. Chtd.(herein known as "Williams, M.D.").

__TMS__: hereby Rentals from Landlord certain office suite space for the purpose of __Medical Spa__. Additionally, __TMS__ has the right to utilize common areas and the right to receive certain services provided by Williams, M.D..

1. Location: 1000 So. Rampart Blvd., Suite 10, Las Vegas, Nevada 89145
   *(Note: Use this as your legal address and business license address)*

2. Office Suite(s): __6__ (herein known as "Rental Space")

3. Term of Rental: The term of this Rental is month to month beginning __May 19, 2010__ 2010 and ending __May__ 20_11_. Thirty (30) days prior to the Rental ending, the __TMS__ must enter into a new agreed upon Rental with the Williams, M.D.. If not the __TMS__ must give written notice that they will not be renewing the Rental and must vacate the office suite and premises on the last day of signed Rental. If __TMS__ fails to give written notice thirty (30) days prior to the rental ending, the existing rental will become a month to month rental until the __TMS__ vacates, with a minimum owing of thirty days rent after the existing rental expires. The existing rent will be increased by 15% for this period.

4. Rent: The __Rentor__ will pay a monthly rent amount of __$6163.00__ and ($6163.00), plus any other services rendered on the monthly invoice to Williams, M.D. without making any deduction or offset.

   (i)   Rent and Additional Service fees are due on the first day of each month.
   (ii)  A Security Deposit equivalent to 1 months rent shall be held by Williams, M.D. and shall be refunded to __TMS - 1 Reeffiwif__ all terms and conditions of this agreement are fulfilled and with thirty (30) days written notice. __TMS__ understands and agrees that this Security Deposit in not to be used as any month's rent or last month's rent. __The Medical Spa__'s remaining security deposit will be refunded within thirty (30) days of the day __TMS__ turn in all keys and vacating the premises.
   (iii) First month and security deposit to be paid at the execution of this agreement.
   (iv)  Payment of the monthly rent and additional services invoice is to be made on the first calendar day of each month. Late charges shall be levied at the rate of 10% of the total invoice plus $5.00 dollars per day, if monies are not received by 4:00 p.m, on the 4th day of the month. If the total monies are not received by the 15th day of the month in which it is due, the Williams, M.D. receives the right to place the __The Medicalgit__ default of this agreement, terminate all services and deny __TMS__ access to the premises.
   (v)   __TMS__ agrees to pay Williams, M.D. $50.00 for each rent check that is returned due to non-sufficient funds.
   (vi)  __TMS__ is responsible for all fees associated with collection agencies, attorney's, court and any other miscellaneous costs incurred by Williams, M.D. to recover all monies required by this Rental.

5. Services and uses included in the monthly rent are as follows:

(i)     Exclusive right to occupy the Rental Space
(ii)    Non- Exclusive right to utilize all common areas. (I.e. - kitchen area, reception area, bathrooms etc.)
(iii)   Utilities
(iv)    Janitorial Services

6. Additional services available:

These extra charges will be billed to _____TMS_____ monthly. Williams, M.D. is not responsible or liable in any way for the above mentioned services. Office equipment supplied by _____TMS_____ in their Rental Space are for _____TMS_____ s sole use only and in no way will _____TMS_____ compete with Williams, M.D.'s commercial enterprise with other _____services_____ s.

7. The telephone services and equipment requested by _____TMS_____ are:
(i)     _____0_____ phone sets

Telephones are provided to the office suite upon move in date. When _____TMS_____ vacates the suite permanently, telephones must be left in suite.

8. Miscellaneous:

9. Monthly Recurring Telephone Charges:
(i) Long distance charges apply___

10. A total amount of _____ & 0/100 ($      ) is due at execution of the Rental agreement which breakdowns as follows:

$ 6163.00     First Month Rent
$ 6163.00     Security Deposit
_____        Other

11. _____TMS_____ may not do any of the following: (a) utilize the space for anything but the Authorized Use; (b) make any alterations or changes to the common area or the Rental Space;(c) suffer or permit any liens or encumbrances arising by or through _____TMS_____ to be placed on Williams, M.D.'s property; (d) assign or sub rent to anyone or business without Williams, M.D.s prior written consent; (e) operate or utilize any equipment or device which results in excessive use of utilities (f) utilize common area or Rental Space in any manner which may create a health, safety, or fire hazard; (g) fail to obey the building's rule and regulations; (h) disturb other _____TMS_____ s or interfere with the quiet enjoyment of their own premises; ( k) use the Rental Space or common area as a residence.

12. _____TMS_____ shall indemnify and hold harmless Williams, M.D. and all agents, servants and employees of Williams, M.D. from and against all claims, losses, damages, expenses (including reasonable attorneys' fees), penalties and charges arising from or in connection with: (a) _____TMS_____ 's use of the Premises during the Rental Term; or (b) from conduct of _____TMS_____ 's business, or (c) from any activity, work or things done, permitted or suffered by _____TMS_____ in or about the Premises during the Rental Term.



_____ shall further indemnify and hold harmless Williams, M.D. from and against any and all claims, loss, damage, expense (including reasonable attorneys' fees), penalty, or charge arising from any default in the performance or obligation on _____'s part to be performed under the terms of this rental, or arising from any negligence of _____, or any _____'s agents, contractors, or employees, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon. If any action or proceeding be brought against Williams, M.D. by reason of any such claim, _____, upon notice from renter, shall defend the same _____'s expense by legal counsel reasonably satisfactory to Williams, M.D.. _____, as a material part of its consideration to renter, hereby assumes all risk of damage to property or injury to persons, in or upon the Premises arising from any cause and _____ hereby waives all claims in respect thereof against Williams, M.D.. Notwithstanding the foregoing, _____ shall not be required to defend, save harmless or indemnify Williams, M.D. from any liability for injury, loss, accident or damage to any person or property resulting from Williams, M.D.'s negligence or willful acts or omissions, or those of Williams, M.D.'s officers, agents, contractors or employees. _____'s indemnity is not intended to nor shall it relieve any insurance carrier of its obligations under policies required to be carried by _____ pursuant to the provisions of this Rental Agreement to the extent that such policies cover the results of negligent acts or omissions of Williams, M.D., its officers, agents, contractors or employees, or the failure of Renter to perform any of its obligations under this Rental.

13. _____ understands that the liability insurance, medical malpractice or workmans comp carried by the Williams, M.D. does not insure against loss of damage to, theft of any claims or cover any of the _____'s personal property wherever situated on the rental premises. _____ shall take out and carry, in _____'s judgment and at _____'s expense, such insurance's _____ shall deem appropriate to insure against loss of, damage to or theft of, _____'s personal and business property and against acts by _____ The Medical_____ and its employees and/or their invites.

14. _____ hereby agrees to: (a) promptly pay rent and all other charges specified herein; (b) comply with the law and any building rules and regulations applicable to _____'s usage of the common areas or Rental Space; (c) pay for repairs of any damage which _____ causes on or about the common area or Rental Space; (d) waive any and all rights if subrogation against Williams, M.D.; (e) vacate the Rental Space upon expiration of this Rental and not holdover unless Williams, M.D. so permits in writing in advance; (e) vacate the Rental Space upon five (5) days written notice from Williams, M.D. if _____ is adjudicated a bankruptcy or _____ files or has filed against any bankruptcy or receivership proceedings or any other similar proceedings; (f) permit Williams, M.D. to enter the Rental Space; without prior appointment for all legitimate business reasons; (g) pay all late charges as per Section 4 (iv).

15. Williams, M.D. shall have no liability to _____ for failures of utilities or other services or for acts of others.

16. In the event the rental space or common area is materially damaged or destroyed by the _____, or any of _____'s agents, contractors or employees, Williams, M.D. may elect to terminate the Rental. In the event the Rental Space is taken under the power if eminent domain, this Rental shall terminate and Williams, M.D. shall be entitled to receive the entire condemnation award.

3

17. Williams, M.D. shall supply 2 entry keys to ___TMS___ . If a key is lost, ___TMS___ must apply to Williams, M.D. for a replacement key (at a charge of $25.00). If ___TMS___ loses a key, ___TMS___ assumes responsibility for the acts of the finder. If ___The Holder___ desires the lock(s) can be changed at the expense of the ___TMS___ . At the expiration of the term of the Rental, all keys must be surrendered by ___TMS___ to the Williams, M.D..

18. Williams, M.D. observes the following holidays: New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Family Day and Christmas Day. If any holidays fall on a Saturday - the holiday will be observed on the Friday before. A half - day will be observed on Christmas Eve Day and New Year's Eve Day. Williams, M.D. reserves the right to modify the holiday schedule with prior written notice to ___TMS___ ten (10) days prior to said modification.

19. Any failure by ___TMS___ to pay rent or any other amount required to be paid hereunder as and when due, the abandonment or vacation of the Rental Space by ___TMS___ , or any failure to observe or perform any other provision of this Rental to be performed by ___TMS___ is an event of default hereunder.

In the event of default, Williams, M.D. shall have all the remedies afforded to Williams, M.D. by law and equity, including summary ejectment procedures. Any rent, charge, fee or other monies owed by ___TMS___ to Williams, M.D. is "rent" for purposes of this rental. Williams, M.D. shall have the right of summary self-help, including locking ___TMS___ out, disconnecting all services, seizure and sale of ___TMS___ 's property situated upon the Rental Space, and removal and storage of ___TMS___ 's property situated upon the Rental Space, at ___TMS___ 's expense.

Time is of the essence. A waiver of one default does not waive time is of the essence. Time is if the essence at all times and need not be reinstated by new notices from Williams, M.D.. Except as otherwise required by law, no grace periods apply nor are any notices of default required to be given by Williams, M.D. to ___TMS___ , except as provided herein. No remedy or election hereunder shall be deemed exclusive but, whenever possible, all remedies shall be cumulative with all other remedies.

20. In the event of any action or proceedings brought by either party against the other under this Rental, the prevailing party shall be entitled to recover its reasonable expenses and attorney's fees incurred in such action or proceeding, as determined by the court. In the event Williams, M.D., in order to protect its rights, intervenes in or becomes a party to, or in the event Williams, M.D. is made a party to, any action or proceedings arising in connection with this rental, ___TMS___ will pay to Williams, M.D., Williams, M.D.'s reasonable expenses and attorney's fees incurred in such action, if determined by the court that ___TMS___ is at fault.

21. Subject to the provisions restricting ___TMS___ 's right to assign and subrent, the covenants and conditions herein contained shall apply to and be binding upon heirs, executors, administrators, personnel representatives, successors and assigns of the parties hereto. This Rental sets forth the entire agreement between the Williams, M.D. and ___TMS___ with respect to the Rental Space and supersedes any prior representations or agreements, oral and written, with respect thereto. Any amendment to this rental must be in writing and signed by the parties hereto. Any notice to ___TMS___ under this rental may be personally delivered to ___TMS___ or mailed to ___TMS___ by first class mail.

22. _____ TMS _____ agrees that during the Term of this Agreement and six (6) months after its termination, _____ TMS _____ will not offer employment to or hire any of the employees of Williams, M.D.. If _____ TMS _____ breaches this provision, _____ TMS _____ will be liable to Williams, M.D. for damages, in the sum of twenty-five percent (25%) of the annual compensation of each employee involved, it being mutually agreed by _____ TMS _____ and Williams, M.D. that this provision for liquidated damages is reasonable.

23. Upon expiration and/or termination of this Rental Agreement, _____ TMS _____ agrees that mail cannot be forwarded by the United States Post Office because of the executive suite situation _____ TMS _____ shall make arrangements, mutually agreed upon by _____ TMS _____ and Williams, M.D. for retrieval of all incoming mail.

24. Keys, entry codes and alarm codes are to be issued to the following:

25. Confidentiality. The terms and conditions of this rental are confidential between the parties hereto. Any disclosure by _____ TMS _____ of the terms and conditions of this rental to any third party or other _____ TMS _____ s could have a significant and detrimental effect upon either/both of the parties hereto. If _____ TMS _____ breaches the confidence of this rental at any time during the Term of this rental or any extension thereof Williams, M.D. shall have the right to do either of the following by written notice to _____ TMS _____ :

    (a)   Declare that the Minimum Rent shall immediately double for the remaining Term of the rental and any extension thereof;

    (b)   _____ TMS _____ shall pay liquidated damages to Williams, M.D. in the amount of

       $5,000.00 (five thousand dollars).

In addition, if _____ TMS _____ checks out the front door key of 1000 So Rampart Building and for whatever reason the key is lost, Williams, M.D. Management will re-key the front door locks and in this case, _____ TMS _____ is wholly responsible for paying the total cost of re-keying the mentioned front doors.

IN WITNESS WHEREOF, the parties hereto have entered into this Rental as of the date first written above.

Carl N. Williams M.D. Chtd.

Carl N. Williams

_Tracy L Hurst_ for The Medical Spa, LLC

Tax ID or
SS# No
Phone (702) 524-6573
Mailing Address P.O. Box 34720, LV NV 89133
The above signed PERSONALLY guarantees payment of this Rental.

5

# EXHIBIT "2"

## Nevada Commercial Rental Agreement

This Commercial Rental Agreement ("Rental Agreement") is made and effective October 17, 2010, between Dr. Carl N. Williams Jr. ("Landlord") and The Med Spa LLC ("Tenant").

Landlord is the party responsible for the land and improvements commonly known and numbered as,

1000 S Ft. Apache, Ste 10, Las Vegas, NV 89145 and legally described as follows (the "Building")

located in the "Boca Park" shopping vicinity, on the Southwest Corner of Ft. Apache and Charleston

in Las Vegas, NV.

Landlord makes available for Rental Agreement a portion of the Building designated as: one half of the building, (the "Rental Premises").

Landlord desires to rent the Rental Premises to Tenant, and Tenant desires to rent the Rental Premises from Landlord for the term, at the Rental Agreement and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

### 1. Term.

A. Landlord hereby rents the Rental Premises to Tenant, and Tenant hereby rent the same from Landlord, for an "Initial Term" beginning October 17, 2010 and ending October 17, 2015. Landlord shall use its best efforts to give Tenant possession as nearly as possible at the beginning of the Rental Agreement term. If Landlord is unable to timely provide the Rental Agreement Premises, rent shall abate for the period of delay. Tenant shall make no other claim against Landlord for any such delay.

B. Tenant may have first option to renew the Rental Agreement for one extended term of Five Years. Tenant shall exercise such renewal option, if at all, by giving written notice to Landlord not less than ninety (90) days prior to the expiration of the Initial Term. The renewal term shall be at the Rental Agreement set forth below and otherwise upon the same covenants, conditions and provisions as provided in this Rental Agreement.

### 2. Rental Agreement.

A. Tenant shall pay to Landlord during the initial Term Rental Agreement of per year, payable in installments of $6,163.00 per month. Each installment payment shall be due on the first day of each calendar month during the Rental Agreement term to Landlord at 1000 South Ft. Apache Drive, Suite 10, Las Vegas, NV 89145 or at such other place designated by written notice from Landlord or Tenant. The Rental Agreement payment amount for any partial calendar months included in the Rental Agreement term shall be prorated on a daily basis. Tenant shall also pay to Landlord a "Security Deposit" in the amount of $6,163.00.

B. The Rental Agreement for any renewed Rental Agreement term, if created as permitted under this Rental Agreement, shall be negotiated at the time of renewal.

### 3. Use

Notwithstanding the forgoing, Tenant shall not use the Rental Agreement Premises for the purposes of storing, manufacturing or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device.

### 4. SubRental Agreement and Assignment.

Tenant shall have the right without Landlord's consent, to assign this Rental Agreement to a corporation with which Tenant may merge or consolidate, to any subsidiary of Tenant, to any corporation under common control with Tenant, or to a purchaser of substantially all of Tenant's assets. Tenant shall have permission to  rent  any part of the Rental Agreement Premises,(like and kind type services)to those of their choice.

### 5. Repairs.

During the Rental Agreement term, Tenant shall make, at Tenant's expense, all necessary repairs to the Rental Agreement Premises. Repairs shall include such items as routine repairs of floors, walls, ceilings, and other parts of the Rental Agreement Premises damaged or worn through normal occupancy, except for major mechanical systems or the roof, subject to the obligations of the parties otherwise set forth in this Rental Agreement.

### 6. Alterations and Improvements.

Tenant, at Tenant's expense, shall have the right to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Rental Agreement Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Rental Agreement Premises, and fasten the same to the premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Rental Agreement term or placed or installed on the Rental Agreement Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Rental Agreement  provided that all damage to the Rental Agreement Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

### 7. Property Taxes.

Landlord shall pay, prior to delinquency, all general real estate taxes and installments of special assessments coming due during the Rental Agreement term on the Rental Agreement Premises, and all personal property taxes with respect to Landlord's personal property, if any, on the Rental Agreement Premises. Tenant shall be responsible for paying all personal property taxes with respect to Tenant's personal property at the Rental Agreement Premises

8. **Insurance**.

A. If the Rental Agreement Premises or any other part of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

B. Landlord shall maintain fire and extended coverage insurance on the Building and the Rental Agreement Premises in such amounts as Landlord shall deem appropriate. Tenant shall be responsible, at its expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Rental Agreement Premises.

C. Tenant and Landlord shall, each at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities of each in the Building with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $1,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. Landlord shall be listed as an additional insured on Tenant's policy or policies of comprehensive general liability insurance, and Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this Paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to expire at least (10) days prior to such expiration. Landlord shall not be required to maintain insurance against thefts within the Rental Agreement Premises or the Building.

9. **Utilities**.

Landlord and Tenant shall share equally, all charges for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Rental Agreement Premises during the term of this Rental Agreement unless otherwise expressly agreed in writing by Landlord. In the event that any utility or service provided to the Rental Agreement Premises is not separately metered, Landlord shall pay the amount due and separately invoice Tenant for Tenant's pro rata share of the charges. Tenant shall pay such amounts within fifteen (15) days of invoice. Tenant acknowledges that the Rental Agreement Premises are designed to provide standard office use electrical facilities and standard office lighting. Tenant shall not use any equipment or devices that utilizes excessive electrical energy or which may, in Landlord's reasonable opinion, overload the wiring or interfere with electrical services to other tenant

10. **Signs**.

Following Landlord's consent, Tenant shall have the right to place on the Rental Agreement Premises, at locations selected by Tenant, any signs which are permitted by applicable zoning ordinances and private restrictions. Landlord may refuse consent to any proposed sign that is in Landlord's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Rental Agreement Premises or use of any other tenant. Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct the foregoing signs. Tenant shall repair all damage to the Rental Agreement Premises resulting from the removal of signs installed by Tenant.

11. **Entry**.

Landlord shall have the right to enter upon the Rental Agreement Premises at reasonable pre notice(24hrs), provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Rental Agreement Premises.

## 12. Parking.

During the term of this Rental Agreement, Tenant shall have the non-exclusive use in common with Landlord, other tenants of the Building, their guests and invitee's, of the non-reserved common automobile parking areas, driveways, and footways, subject to rules and regulations for the use thereof as prescribed from time to time by Landlord. Landlord reserves the right to designate parking areas within the Building or in reasonable proximity thereto, for Tenant and Tenant's agents and employees. Separated structured parking, if any, located about the Building is reserved for tenants of the Building who rent such parking s paces. Tenant hereby rents from Landlord unlimited spaces in such structural parking area, such spaces to be on a first come-first served basis.

## 13. Building Rules.

Tenant will comply with the rules of the Building adopted and altered by Landlord from time to time and will cause all of its agents, employees, invitee's and visitors to do so; all changes to such rules will be sent by Landlord to Tenant in writing. The initial rules for the Building are attached hereto as Exhibit "A" and incorporated herein for all purposes.

## 14. Damage and Destruction.

Subject to Section 8 A. above, if the Rental Agreement Premises or any part thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then Tenant shall have the right within ninety (90) days following damage to elect by notice to Landlord to terminate this Rental Agreement as of the date of such damage. In the event of minor damage to any part of the Rental Agreement Premises, and if such damage does not render the Rental Agreement Premises unusable for Tenant's purposes, Landlord shall repair such damage, promptly, at the cost of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions, inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Rental Agreement term that the Rental Agreement Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rental Agreements and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Rental Agreement

## 15. Default.

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Rental Agreement ended and terminated by giving Tenant written notice of such intention, and if possession of the Rental Agreement Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

## 16. Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Rental Agreement Premises during the term of this Rental Agreement.

17. **Condemnation**.

If any legally, constituted authority condemns the Building or such part thereof which shall make the Rental Agreement Premises unsuitable for leasing, this Rental Agreement shall cease when the public authority takes possession, and Landlord and Tenant shall account for Rental Agreement as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

18. **Subordination**.

Tenant accepts this Rental Agreement subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Rental Agreement Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Rental Agreement on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Rental Agreement to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Rental Agreement Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Rental Agreement or atoning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein require d to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Rental Agreement is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Rental Agreement have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

19. **Security Deposit**.

The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Rental Agreement, it being expressly understood that the Security Deposit shall not be considered an advance payment of Rental Agreement or a measure of Landlord's damages in case of default by Tenant. Unless otherwise provided by mandatory law or regulation, the Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any past rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Rental Agreement, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant. If Landlord transfers its interest in the Premises during the term of this Rental Agreement, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

## 20. Notice.

Any notice required or permitted under this Rental Agreement shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to Landlord to:

Dr. Carl N. Willilams, Jr. MD CHTD

2020 Goldring #504, Las Vegas, NV 89106

If to Tenant to:

The Medical Spa, LLC

1000 South Ft. Apache Drive, Suite 10, Las Vegas, NV 89145

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

## 21. Brokers.

Tenant represents that Tenant was not shown the Premises by any real estate broker or agent and that Tenant has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this RENTAL AGREEMENT.

## 22. Waiver.

No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

## 23. Memorandum of RENTAL AGREEMENT.

The parties hereto contemplate that this Rental Agreement should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Rental Agreement to be recorded for the purpose of giving record notice of the appropriate provisions of this Rental Agreement.

## 24. Headings.

The headings used in this Rental Agreement are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Rental Agreement.

## 25. Successors.

The provisions of this Rental Agreement shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

### 26. Consent.

Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Rental Agreement.

### 27. Performance.

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Rental Agreement, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lesser of twelve percent (12%) per annum or the then highest lawful rate. If this Rental Agreement terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the unreimbursed balance plus accrued interest to Tenant on demand.

### 28. Compliance with Law.

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Rental Agreement Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Rental Agreement Premises.

### 29. Final Agreement.

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

### 30. Governing Law.

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Nevada.

IN WITNESS WHEREOF, the parties have executed this Rental Agreement as of the day and year first above written.

Landlord – Dr. Carl N. Williams Jr. MD CHTD

The Medical Spa, LLC – Tracy L. Hurst, Managing Member